IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PADCOM, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | Civ. No. 03-983-SLR |
| | ) | |
| NETMOTION WIRELESS, INC., | ) | |
| | ) | |
| Defendant and | ) | |
| Counterclaim | ) | |
| Plaintiff. | ) | |

---

Josy W. Ingersoll, Esquire and Adam Poff, Esquire of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Plaintiff and Counterclaim Defendant. Of Counsel: Neil F. Greenblum, Esqire, Jill M. Browning, Esquire and Van C. Ernest, Esquire of Greenblum & Bernstein, PLC, Reston, Virginia.

William J. Marsden, Jr., Esquire and Sean P. Hayes, Esquire of Fish & Richardson, PC, Wilmington, Delaware, Katherine Kelly Lutton, Esquire of Fish & Richardson, Redwood City, California, Barry K. Shelton, Esquire of Fish & Richardson, Austin, Texas. Counsel for Defendant and Counterclaim Plaintiff.

---

**MEMORANDUM OPINION**

Dated: February 𝒹𝒽, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On October 27, 2003, Padcom, Incorporated ("plaintiff")
filed this action against NetMotion Wireless Incorporated
("defendant") for infringement of certain claims of United States
Patent Nos. 6,198,920 ("the '920 patent") and 6,418,324 ("the
'324 patent").  (D.I. 1)  On June 9, 2004, plaintiff filed a
first amended complaint including infringement of United States
Patent No. 6,826,405 ("the '405 patent"), and on June 30, 2004,
defendant filed a counterclaim.  (D.I. 44, 47)  On January 5,
2005, plaintiff filed a second amended complaint.  (D.I. 89)
Included in the second amended complaint were counts of common
law unfair competition and unfair and deceptive trade practices
under § 43 of the Lanham Act.  (D.I. 89)  On January 19, 2005,
with defendant's answer to the second amended complaint,
defendant filed several counterclaims, including tortious
interference with contract and business expectancies.  (D.I. 95)

Currently before the court are the parties' cross motions
for summary judgment regarding the common law unfair competition,
the unfair and deceptive trade practices, and the tortious
interference claims.  (D.I. 286, 296)

## II.   BACKGROUND

Plaintiff is a company that develops, makes, licenses, sells
and services software and hardware products that enhance
connectivity for wireless network users and simplify

administration, control and support of mobile solutions.  (D.I. 89 at ¶ 12)  In about 1995, plaintiff created and provided internet protocol ("IP") data over private radio frequency ("RF") networks for its wireless customers.  (Id. at ¶ 13)  Plaintiff also developed technology that enabled communications over multiple active networks by using a variety of protocols to seamlessly switch among the networks, thus maintaining and improving connectivity.  (Id. at 14)  Plaintiff is the owner of the '324 patent, entitled "Apparatus and Method for Transparent Wireless Communication Between a Remote Device and Host System," the '920 patent, entitled "Apparatus and Method for Intelligent Routing of Data Between a Remote Device and a Host System," and the '405 patent, entitled "Apparatus and Method for Intelligent Routing of Data Between a Remote Device and a Host System."  (D.I. 89 at ¶¶ 8-10)  One of plaintiff's products incorporating the technology covered by the patents is TotalRoam Mobile Virtual Network solution, which enables roaming among dissimilar networks and provides static IP addresses for dynamic IP addressing networks.  (Id. at ¶ 15)

    Plaintiff has entered into extensive negotiations with telecommunications service providers to sell the technology covered by the patents to the service providers' customers in conjunction with wireless services.  (Id. at ¶ 17)  One such customer is AT&T Wireless Services, Incorporated ("ATTWS").  (Id.

2

at ¶ 18) Plaintiff asserts that it and ATTWS have engaged in negotiations to enter a contractual relationship to implement plaintiff's patented products, such as Total Roam MVN in all of ATTWS's relevant wireless services provided to ATTWS's subscribers. (Id. at ¶ 18)

Defendant also has developed patented technology that allows mobile users to maintain persistent, secure connections to applications, networks and data as they seamlessly roam between offices, buildings or global locations. (D.I. 95 at 6) In February of 2001, defendant entered the telecommunications software market. (D.I. 340 at 3) Defendant's "Mobility" product is sold to wireless service provider customers. (D.I. 95 at ¶ 13) The two companies have been competing with each other almost exclusively in the market. (D.I. 340 at 4)

## A. Facts Related to Defendant's Tortious Interference Claim

In 2002, ATTWS established a program to migrate its Wireless Data Network customers from the then current wireless protocol (called CDPD) to its next generation system (referred to as GPRS). (D.I. 338 at 6) Migration to GPRS would cause various hardships to customers including replacing equipment. (Id.) Many of the public safety agencies that were customers of ATTWS were using a feature of CDPD called "static IP." GRPS, however, uses dynamic IP and not static IP. (Id.) ATTWS sought to purchase middleware to emulate static IP on the GPRS system so

3

that its customers would not have to rewrite or repurchase their application software.  (Id.)  ATTWS wanted a middleware provider and expressed interest in only dealing with one provider.  (Id.) In the spring of 2003, ATTWS considered competing proposals from plaintiff and defendant and ultimately, even though plaintiff's product was the least expensive option, chose defendant's product.  (Id. at 6-7)  As a result of the contract, defendant's Mobility product was distributed to ATTWS customers.[1]  (Id.)

Defendant asserts that, as a result of losing the ATTWS contract, plaintiff engaged in "reactionary tactics."  (Id.)  In October 2003, plaintiff filed the present suit.  (Id. at 9) Plaintiff immediately contacted ATTWS regarding the suit.  (Id.) Defendant asserts that a "letter writing campaign" began through which plaintiff asserted various allegations against ATTWS in an attempt to extract business concessions from ATTWS.  (Id.) Plaintiff first communicated with ATTWS in November of 2003, expressing a concern that ATTWS' actions were excluding plaintiff from the market, potentially infringing its patents; ATTWS' acts of offering bundled software for free would devalue plaintiff's technology.  (D.I. 338 at 10, D.I. 297 at 5)  The correspondence lasted through March 2004.  (Id.)  ATTWS altered its program to

_____

[1]While defendant was the sole source provider selected by ATTWS for its middleware product, some ATTWS customers needed a static IP solution and the ability to roam between IP and non-IP based protocols.  (Id. at 8)  These ATTWS customers used plaintiff's product.  (Id.)

4

include plaintiff's software in its offer sheet.  (Id. at 12)
Eventually ATTWS also began to "aggressively promote" plaintiff's
product.  (Id.)  Plaintiff's sales force allegedly misrepresented
to ATTWS customers that ATTWS would pay for them to get
plaintiff's upper-tier roaming products rather than the static IP
product.  (Id.)  In response to these misrepresentations, ATTWS
made special purchases from plaintiff and provided its customers
with free upgraded plaintiff products.  (Id.)

**B.   Facts Related to Plaintiff's Unfair Competition Claims**

In the summer of 2003, defendant hired Matt Olszewski, a
former regional sales manager of plaintiff.  (D.I. 340 at 4)
Plaintiff alleges that defendant used Matt Olszewski to uncover
confidential secrets about plaintiff's customers and to begin a
"recruitment program" to hire other key plaintiff employees.
(Id.)  Defendant allegedly posed questions about plaintiff's
financial stability to plaintiff's current and potential
customers in spite of the fact that defendant's chief executive
officer had previously specifically concluded that there was no
basis to challenge plaintiff's financial stability.  (D.I. 340 at
5)  Defendant developed a buy-back program through which
customers of plaintiff were given a free download of defendant's
software if, in exchange, the customers agree to provide
defendant with plaintiff's proprietary software and agree not to
use plaintiff's software in the future.  (Id. at 6)  The program

5

has not been implemented as a result of the present lawsuit.
(Id. at 6)  Finally, three days after filing the lawsuit and
before receiving advice of counsel, defendant stated to
prospective customers that the suit was a "PR stunt intended to
slow our momentum."  (Id. at 7)  The statements were made despite
having previously concluded that the plaintiff's patents could
possibly lead to an injunction.  (Id. at 7)

## III.  STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The moving party bears the burden of proving that no
genuine issue of material fact exists.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).
"Facts that could alter the outcome are 'material,' and disputes
are 'genuine' if evidence exists from which a rational person
could conclude that the position of the person with the burden of
proof on the disputed issue is correct."  Horowitz v. Fed. Kemper
Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal
citations omitted).  If the moving party has demonstrated an
absence of material fact, the nonmoving party then "must come
forward with 'specific facts showing that there is a genuine

6

issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## IV. DISCUSSION

### A. Defendant's Counterclaim for Tortious Interference

Delaware law requires that four elements be established for a claim of tortious interference with prospective contractual relations: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach of termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted. Lucent Information Management, Inc. v. Lucent Tech., Inc., 5 F.Supp. 2d 238, 243 (D. Del. 1998). All of these factors must be considered "in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." DeBonaventura

7

v. Nationwide Mut. Ins. Co., 428 A.2d 1151, 1153 (Del. Super. 1981). Defendant must show that, with respect to any threats of patent infringement made to ATTWS, plaintiff was acting in bad faith. Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d 1340, 1353 (Fed. Cir. 1999) (holding that "[f]ederal patent law bars the imposition of liability [under federal or state law] for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith).

Plaintiff asserts that defendant has not demonstrated that it had a valid business expectancy with ATTWS. The evidence of record shows that defendant and ATTWS had a contract where defendant provided middleware for ATTWS. While the contract was not exclusive, there is evidence that ATTWS expressed an intention only to use one middleware provider. As a result, the court finds that a genuine issue of material fact exists regarding whether a business expectancy existed.[2]

Defendant's claim includes an allegation that plaintiff threatened ATTWS with patent infringement. Plaintiff asserts that defendant has presented no evidence of bad faith on the part of plaintiff.

---

[2]Plaintiff also asserts that it had no knowledge of the business relationship between ATTWS and defendant. However, ATTWS initially faced a decision to chose between plaintiff and defendant for its services and, after proposals were submitted by both plaintiff and defendant, ATTWS chose defendant. The court denies plaintiff's motion for summary judgment based on its lack of knowledge of the relationship between ATTWS and defendant.

8

A patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers.  Accordingly, a patentee must be allowed to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction.

Globetrotter Software, Inc. v. Elan Computer Group, Inc., 362 F.3d 1367, 1374 (Fed. Cir. 2004) (internal citations omitted) "The federal patent laws thus bar state-law liability for communications concerning alleged infringement so long as those communications are not made in 'bad faith.'" Id. at 1374-75.  Bad faith can be demonstrated by a patentee's threatening to enforce a patent that it knew was either invalid, procured by fraud on the Patent and Trademark Office, or not infringed.  See Zenith, 182 F.3d at 1354.  The bad faith standard cannot be met in the absence of a showing that the claims asserted were objectively baseless.  Globetrotter Software, Inc. V. Elan Computer Group, Inc., 362 F.3d 1367, 1375 (Fed. Cir. 2004).  There is no evidence that plaintiff knew the patents were invalid, procured by fraud or not infringed.  Furthermore, there is no evidence that plaintiff's claims that ATTWS was infringing were objectively baseless.  Therefore, to the extent the summary judgment motion addresses assertions of patent infringement or litigation, it is granted.

However, defendant asserts that plaintiff not only

9

threatened patent litigation, but also antitrust liability.
After reviewing the letters, the court finds several instances
where an issue of fact exists regarding whether plaintiff
asserted potential antitrust liability against ATTWS.
Furthermore, defendant raised, and plaintiff did not rebut, an
issue of fact regarding whether the antitrust liability
assertions were unfounded.  The court concludes there is a
genuine issue of material fact regarding whether plaintiff
unfairly attempted to dissuade ATTWS from using defendant as its
middleware provider by threatening antitrust liability.  See
Lipson v. Anesthesia Services, P.A., 790 A.2d 1261, 1288 (Del.
Super. 2001) (concluding a plan to dissuade nurse anesthetists
from working for former member physician by threatening
retribution within the Department of Anaesthesiology, if proven,
was an unfair competitive practice).  The summary judgment motion
related to the allegations of antitrust liability is denied.

     Defendant asserts that plaintiff wrongfully interfered with
defendant's business expectancy when it made statements to ATTWS
customers to the effect that customers could get plaintiff's
software for free from ATTWS.  The court grants summary judgment
related to these statements because defendant raises no evidence
of how these statements impacted, if at all, the defendant-ATTWS
business expectancy.

     Plaintiff argues that defendant has raised no evidence that

10

the alleged interference was the cause of any harm to defendant.
The question turns on whether plaintiff's interference caused
ATTWS to reject defendant's services as a middleware provider in
favor of plaintiff's services as a middleware provider. See
Malpiede v. Townson, 780 A.2d 1075, 1100 (Del. Supr. 2001). The
facts evidence that ATTWS, when initially choosing a middleware
provider, considered both plaintiff and defendant and chose
defendant, even though defendant's prices were higher. The facts
also suggest that ATTWS preferred to use only a single vendor.
ATTWS did not sign an exclusive contract with defendant, but the
facts support the argument that, prior to plaintiff's
"interference," the only time ATTWS deviated from using
defendant's services was when ATTWS customers needed the
technology to roam between "dissimilar networks." Defendant
cites evidence that suggests ATTWS began to aggressively promote
plaintiff against ATTWS' initial plan only as a result of
plaintiff's interference. Plaintiff, on the other hand, cites
evidence that suggests the litigation between it and defendant
and its actions had no bearing on ATTWS's decision to promote its
product and services. Plaintiff and defendant each have
different versions of the facts leading up to ATTWS's use of
plaintiff as a middleware provider. Whether plaintiff's
interference was the cause of harm to defendant raises a genuine
issue of material fact. The court denies plaintiff's motion for

11

summary judgment in this regard.

Plaintiff finally asserts that defendant suffered no damages and, therefore, the tortious interference claim fails. Plaintiff asserts that, because the contract between ATTWS and defendant was not exclusive, no action can lie against plaintiff when ATTWS was under no obligation to only use defendant. The argument parallels the argument that there is no business expectancy. Defendant must prove that it suffered damages, for example, "either in terms of profits that it would have achieved or in terms of profits that [plaintiff] unjustly obtained." Delaware Express Shuttle Inc. v. Older, 2002 WL 31458243, *23 (Del. Ch. 2003). Defendant asserts that plaintiff interfered with defendant's business expectancy in providing middleware to ATTWS by improperly influencing ATTWS to give plaintiff the middleware business. Such conduct is actionable under Delaware law, see Gill v. Delaware Park, 294 F.Supp. 2d 638, 646 (D. Del. 2003), and the existence of such a business expectancy raises a genuine issue of material fact. Defendant states that "every static-IP product provided by [plaintiff] to ATTWS' customers who did not require roaming between 'dissimilar networks' as claimed in [plaintiff's] patent, was a license fee that was properly paid to [defendant] pursuant to the . . . [business expectancy] between [defendant] and ATTWS." Defendant has raised a genuine issue of material fact regarding the damages incurred as a result of

12

plaintiff's alleged interference.

## B.   Plaintiff's Claim of Common Law Unfair Competition

Defendant requests summary judgment on plaintiff's unfair competition claim. "Unfair competition is a form of tortious interference with prospective economic advantage." Int'l Bus. Machines Corp. v. Comdisco, Inc., 1993 WL 259102, *21 (Del. Super. 1993). "'The elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm.'" Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1057 (Del. Super. 2001) (citing Rypac Packaging Machinery Inc. v. Coakley, 2000 WL 567895 * 8 (Del. Ch. 2000)); see also Delaware Solid Waste Auth. v. E. Shore Envtl, Inc., 2002 WL 537691, *6 (Del. Ch. 2002). "'Only wrongful interferences will satisfy the tort, as some interferences are seen as justified or privileged under the aegis of competition . . . Unfair competition, which is not privileged, includes fraud, intimidation, or disparagement.'" Delaware Solid Waste Auth., 2002 WL 537691, at * 6 (citing Int'l Bus. Machines Corp., 1993 WL 259102, at *22).[3]

---

[3]Plaintiff asserts that summary judgment is not appropriate because plaintiff has established that defendant's practices are unfair under "the common law tort of unfair competition, as codified under Delaware's Deceptive Trade Practices Act ('DTPA')." Plaintiff only alleged common law unfair competition

13

Plaintiff alleges that defendant engaged in a pattern of acts that amount to unfair competition. These acts include the hiring of former plaintiff employees and using them to obtain confidential information on plaintiff's clients, targeting plaintiff's potential and current customers and feeding them negative assessments of plaintiff's products, misdirecting plaintiff's potential and current customers using plaintiff's trademark in Google searches,[4] misleading plaintiff's potential and current customers with rumors of plaintiff's financial trouble, attempting to implement a buy back program designed to obtain copies of plaintiff's confidential product, and misrepresenting the importance of the present lawsuit to potential and current customers. Plaintiff asserts that all of these actions, taken as a whole, demonstrate the bad faith intent of defendant to compete unfairly. Declining to take such an overly broad definition of unfair competition, the court will address each of these acts individually for an unfair act.

Defendant hired plaintiff's former regional sales manager, Matt Olszewski. The evidence demonstrates that defendant asked Matt Olszewski for his input regarding certain customers of

in the complaint. While the DTPA may be instructive on certain issues, plaintiff's claim is limited to common law unfair competition, as set out by the Delaware courts.

[4]The court fails to understand how this fact has any relevance to the unfair competition claim and, therefore, declines to address it further.

14

plaintiff.[5] However, this, by itself, does not amount to unfair competition. See Wilmington Trust Co. v. Consistent Asset Management Co., 1987 WL 8459, *5 (Del. Ch. 1987) ("An employee who achieves technical expertise or general knowledge while in the employ of another may thereafter use that knowledge in competition with his former employer, so long as he does not use or disclose protected trade secrets in the process."). Furthermore, "[i]n the absence of an enforceable non-compete provision, an employee who leaves one employer to join another is under no obligation to refrain from dealing with clients from the earlier employment." Tansey-Warner v. Phelan, 1999 WL 182578, *2 (Del. Ch. 1999); Wilmington Trust Co. v. Consistent Asset Management Co., Inc., 1987 WL 8459, *8 (Del. Ch. 1987) ("In the absence of an express contract [containing a covenant not to compete], an employee who leaves and joins or establishes a competing business, may properly solicit trade from those

_____

[5]An email to Matt Olszewski reads:

> Here's an initial target list. The idea is that . . .
> I would reach out to these customers by phone. Your
> input on this list is welcome. We only want to target
> Padcom's larger customers. If you know some of these
> are incredibly happy Padcom customers we'll remove them
> from the list. If we're missing some obvious target
> customers let me know.

(D.I. 341, ex. 28) Furthermore, negating any hint of bad faith, the email reads: "In your case we also don't want you in the middle of this because of your former Padcom employment. Don't want anyone crying foul." Id.

customers whom he dealt with in his previous employment.")
(internal citations omitted). Plaintiff has not alleged theft of
a confidential list,[6] but rather that the former employee called
upon knowledge from his experience with defendant. This does not
amount to unfair competition.[7]

Plaintiff also asserts that defendant targeted plaintiff's
customers and prospective customers to tell them of installation
difficulties with plaintiff's software.[8] Merely soliciting a
competitor's customers does not amount to unfair competition.

---

[6]Plaintiff presents an email where Matt Olszewski states he
will "go thru [sic] my notes that I have on them over the
weekend." (D.I. 341, ex. 28)

[7]Plaintiff presented no evidence to support the accusation
that defendants engaged in a "recruitment program to hire other
key . . . employees." The only support in the record is an email
between Matt Olszewski and a NetMotion employee discussing a
Padcom employee named Tony Celia. The Netmotion employee asked
Matt Olszewski whether Tony Celia "is qualified and would be open
to exploring a SE job on the East Coast with NetMotion?" Matt
Olszewski responded with: "Regarding Tony Celia, he is very good
technically and with customers he would be qualified. I can not
see him leaving Padcom, but who knows. . . I can also explore
some people that I know and see what there [sic] level of
interest is." (D.I. 341, ex. 27) This does not raise a genuine
issue of fact necessary to survive a summary judgment motion.

[8]Plaintiff points to emails from defendant to potential
customers that include information regarding customer complaints.
(D.I. 342, ex. 43) ("The other bit of news is that we were down
at Orange County this week - as you may recall, they are a new
NetMotion customer who has been quite dissatisfied with the
Padcom Total Roam product.") (D.I. 341, ex. 20) ("In contrast
[to NetMotion customers], Padcom customers are often not
satisfied with their product. In addition to functionality
concerns, they complain of installation, configuration and
stability.").

16

See Delaware Solid Waste Authority v. Eastern Shore

Environmental, Inc., 2002 WL 537691, *7 (Del. Ch. 2002).

Furthermore, comparative advertising when truthful and

nondeceptive is not actionable. See Castrol Inc. v. Pennzoil

Co., 987 F.2d 939, 941 (3d Cir. 1993). Plaintiff has not

produced evidence to raise a genuine issue of material fact

regarding whether misrepresentations were made in the course of

soliciting customers.[9]

Plaintiff next asserts that defendant misled consumers by

questioning plaintiff's financial stability.[10] Such statements,

---

[9] The evidence plaintiff uses in support is a series of
emails. In an email to a potential customer, a NetMotion
employee wrote: "I have tried to make sure that [you] have the
latest data on what we're hearing/seeing in the field regarding
Padcom. Self-serving? . . . heck yes. But also accurate."
(D.I. 342, ex. 35) In an email to the same potential customer, a
NetMotion employee wrote: "[W]e've uncovered more Padcom
customer converts." The email continued on to list these
"converts." (Id., ex. 36) Again writing to a potential
customer, NetMotion writes: "I've taken the liberty of attaching
an internal email string that describes what our Sales Manager
and SE encountered when they met with Padcom customers Fremont
and Milpitas last Friday. Lots of customer frustration with
Padcom . . . they'll be switching to NetMotion. . . . I can
assure you that the customer dissatisfaction with Padcom is real
and would be corroborated by reference calls." (D.I. 342, ex.
39) Some of the emails include the names of customers who
switched from Padcom to NetMotion. Plaintiff has produced no
evidence that these statements are misrepresentations or false.

[10] In the Sprint pitch, NetMotion included: "We question
Padcom's financial viability - and their ability to provide
support to SprintPCS and its customers." (D.I. 341, ex. 12) In
an email to a potential client, NetMotion wrote: "We question
their staying-power. Our understanding is that they have a
single investor that has the company on a 'short leash.' It
would be regrettable if SprintPCS customer's were to find that

17

if false or misleading, would constitute unfair competition.
Defendant claims that it was merely encouraging customers and
potential customers to look into plaintiff's financial history
and to conduct due diligence.  However, plaintiff produced
evidence that at least one potential customer, as a result of
defendant's remarks, believed plaintiff had an insecure financial
situation.[11]  Furthermore, plaintiff has raised a genuine issue
of material fact as to the accuracy of the statements made by
defendant and that defendant knew the statements were
inaccurate.[12]  Summary judgment on this issue is denied.

    Plaintiff asserts that the buy-back program contemplated by
defendant constitutes unfair competition.[13]  Although the program

_____

their software provider . . . is either providing poor support,
no longer enhancing their product, or has gone out business
completely."  (Id., ex. 6)  In an internal email, a NetMotion
employee stated one of his "Key Messages" to customers was to
"[r]aise doubts regarding Padcom's fin'l [sic] stability."  (Id.,
ex. 7)  Again, in an internal email, a NetMotion employee wrote
that one of the "primary points" he had been making with a
potential customer was that Padcom has a "[v]ery murky funding
history."  (Id., ex. 13)

[11](D.I. 341, ex. 10)  The same potential customer had
earlier expressed an intention to "move ahead with Pad Com."
(Id., ex. 6)

[12]The former Chief Executive Officer of NetMotion wrote an
email stating:  "I don't think we have enough solid info [sic] to
infer that Padcom is financially challenged."  (D.I. 341, ex. 5)
In his deposition, this NetMotion employee admitted that beyond
published information, he did not have knowledge of Padcom's
funding.  (Id., ex. 38)

[13]The court finds no reason to deviate from the rationale of
the Delaware Deceptive Trade and Practices Act that allows

18

was never implemented (D.I. 341, ex. 4), the court is not convinced by defendant that the buy-back program is fair competition. Plaintiff has raised genuine issues of material fact with respect to the effects of the program on competition and the intent of defendant in implementing such a program.[14]

## C.   Lanham Act Unfair Competition

Section 43(a) of the Lanham Act, states in pertinent part:

(1) Any person who ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which--

* * *

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities ... of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). The Third Circuit requires that a Lanham Act plaintiff prove by a preponderance of the evidence that: (1) defendant made false or misleading statements as to its product, or those of the plaintiff; (2) there was actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception was material in that it is likely to

---

against it under the principles of equity and on terms that the court considers reasonable."). Defendant's standing argument for lack of ongoing harm is rejected.

[14]The court finds plaintiff's assertion that defendant's response to the present lawsuit is unfair competition is without merit.

19

influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. See Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms, Inc., 19 F.3d 125, 129 (3d Cir. 1994). "If a plaintiff proves that the challenged commercial claims are 'literally false,' a court may grant relief without considering whether the buying public has actually been mislead." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer, 290 F.3d 578, 586 (3d Cir. 2002). Representations constitute commercial advertising if they consist of:

> 1) commercial speech; 2) by a defendant who is in commercial competition with plaintiff; 3) for the purpose of influencing consumers to buy defendant's goods or services; 4) that is disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within the industry.

Enzo Life Sci., Inc. v. Digene Corp., 295 F.Supp. 2d 424, 428 (D. Del. 2003). Defendant's conduct, as described in the preceding section, also constitutes the basis for the Lanham Act claim, including feeding customers negative assessments of plaintiff's products and spreading rumors of plaintiff's financial trouble. Defendant asserts that the statements made were not false or misleading and were not sufficiently disseminated to constitute advertising or promotion.

The court concludes, as discussed above, that plaintiff has produced sufficient evidence to raise a genuine issue of material

fact regarding the accuracy of certain statements made and
whether they constitute misrepresentations.  Plaintiff asserts
that the statements made regarding plaintiff's financial status
are false.  Plaintiff has raised a genuine issue of material fact
as to the legitimacy of these statements made by defendant and,
therefore, survives summary judgment.

Defendant argues that the statements were not disseminated
because they were made to a small number of recipients.
Defendant provides no cite to a threshold number of individuals
to whom the false statements must be circulated before liability
attaches. The court declines to grant a summary judgment motion
on this argument; plaintiff has raised a genuine issue of
material fact that defendant has not rebutted regarding whether
making a statement to a small number of wireless providers, in
this market, will effect a large customer base.  See Seven-Up Co.
v. Coca-Cola Co., 86 F.3d 1379, 1386 (5th Cir. 1996) ("Where the
potential purchasers in the market are relatively limited in
number, even a single promotional presentation to an individual
purchaser may be enough to trigger the protection of the Act.").

## V.   CONCLUSION

For the reasons discussed above, plaintiff's motion for
summary judgment is denied in part and granted in part and
defendant's motion for summary judgment is granted in part and
denied in part.  An order consistent with this memorandum shall

21

issue.