IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PADCOM, INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | Civ. No. 03-983-SLR |
| | ) | |
| NETMOTION WIRELESS, INC., | ) | |
| | ) | |
| Defendant and | ) | |
| Counterclaim | ) | |
| Plaintiff. | ) | |

Josy W. Ingersoll, Esquire and Adam Poff, Esquire of Young,
Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware.  Counsel
for Plaintiff and Counterclaim Defendant.  Of Counsel:  Neil F.
Greenblum, Esqire, Jill M. Browning, Esquire and Van C. Ernest,
Esquire of Greenblum & Bernstein, PLC, Reston, Virginia.

William J. Marsden, Jr., Esquire and Sean P. Hayes, Esquire of
Fish & Richardson, PC, Wilmington, Delaware, Katherine Kelly
Lutton, Esquire of Fish & Richardson, Redwood City, California,
Barry K. Shelton, Esquire of Fish & Richardson, Austin, Texas.
Counsel for Defendant and Counterclaim Plaintiff.

**MEMORANDUM OPINION**

Dated: February 22, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.   INTRODUCTION

On October 27, 2003, Padcom, Incorporated ("plaintiff")
filed this action against NetMotion Wireless Incorporated
("defendant") for infringement of certain claims of United States
Patent Nos. 6,198,920 ("the '920 patent") and 6,418,324 ("the
'324 patent").  (D.I. 1)  On June 9, 2004, plaintiff filed a
first amended complaint including infringement of United States
Patent No. 6,826,405 ("the '405 patent") and on June 30, 2004,
defendant filed a counterclaim.  (D.I. 44, 47)  On January 5,
2005, plaintiff filed a second amended complaint.  (D.I. 89)

The asserted claims have been narrowed to claims 6 and 16 of
the '920 patent, claims 10, 49, 58, 60 and 67 of the '324 patent
and claims 18, 19, 22, 23, 39, 44, 68 and 71 of the '405 patent.
Before the court are defendant's motion for summary judgment of
invalidity of the asserted claims of the '405 patent under 35
U.S.C. § 112 and plaintiff's motion for partial summary judgment
of no invalidity of the asserted claims of the '324 and '405
patents under 35 U.S.C. § 112.

## II.   Background

### A.   The Parties

Plaintiff is a company that develops, makes, licenses, sells
and services software and hardware products that enhance
connectivity for wireless network users and simplify
administration, control and support of mobile solutions.  (D.I.

89 at ¶ 12)  In about 1995, plaintiff created and provided
internet protocol ("IP") data over private radio frequency ("RF")
networks for its wireless customers.  (Id. at ¶ 13)  Plaintiff
also developed technology that enabled communications over
multiple active networks by using a variety of protocols to
seamlessly switch among the networks, thus maintaining and
improving connectivity.  (Id. at 14)

In February of 2001, defendant entered the
telecommunications software market.  (D.I. 340 at 3)  Defendant
developed patented technology that allows mobile users to
maintain persistent, secure connections to applications, networks
and data as they seamlessly roam between offices, buildings or
global locations.  (D.I. 95 at 6)

**B.   Technology**

In the mid-1990s, there were many different wireless (e.g.,
cellular) communications networks.  (D.I. 266 at 3)  Examples
include a large variety of proprietary radio systems licenses for
private or government use and public wireless networks such as
those used for cell phone communications.[1]  (Id.)  Most of these
wireless networks were designed for voice communication and did

---

[1]The standards used for the public wireless networks
included Advanced Mobile Phone System (AMPS), Global System for
Mobile Communications (GSM) used by Cingular and T-Mobile, and
Code Division Multiple Access (CDMA) which is the standard used
by carries such as Verizon Wireless, Sprint PCS and Alltel.
(D.I. 266 at 4)

not provide interfaces or protocols for data communication, such as transferring text messages, emails, pictures or video messages wirelessly.  (Id.)  To address these needs, additional standards were established so that data could be carried over public wireless networks originally designed for voice.[2]  (Id.)  These standards enabled use of the industry-standard network format known as the Internet Protocol (IP) for such data communications. (Id.)  Throughout the 1990s, private networks, used primarily by public safety services like law enforcement and companies with field service employees, remained proprietary and inherently incompatible with one another.  (Id.)  They did not, at that time, use the IP.

A need existed to convert data between mobile devices (such as laptops) and host devices (such as computers on a wired network), regardless of the networks connecting them.  In other words, there existed a need to allow two devices on dissimilar or incompatible networks to talk to one another.  (Id.)

The mobile computing community recognized the utility of permitting the mobile commuting device to automatically roam from network to network without disrupting the sending and receiving of data.  (D.I. 284 at 3)  Typically, most applications or

---

[2]One example of such a standard is Cellular Digital Packet Data (CDPD), which added the capability of sending and receiving data over existing AMPS analog cellular telephone networks. (D.I. 266 at 4)

3

communication sessions would be disrupted once the device was no longer connected to the first network.  (Id.)  This caused the data transmission to stop and the user would manually restart the transmission once connectivity on the new network was obtained. (Id.)

### C.    Patents in Suit

The invention of the patents in suit is generally directed to sending and receiving a data transmission over different wireless data networks and switching among these different networks without interrupting the data transmission or disrupting the application.  Plaintiff is the owner of the '324 patent entitled "Apparatus and Method for Transparent Wireless Communication Between a Remote Device and Host System," the '920 patent entitled "Apparatus and Method for Intelligent Routing of Data Between a Remote Device and a Host System," and the '405 patent entitled "Apparatus and Method for Intelligent Routing of Data Between a Remote Device and a Host System."  (D.I. 89 at ¶¶ 8-10) (collectively called "the patents in suit")

The patents in suit are continuations-in-part of an earlier patent, United States Patent No. 5,717,737 (not in suit).  The first of the patents in suit was the '324 patent, filed September 17, 1997.  The '920 patent, filed March 16, 2000, and the '405 patent, filed June 10, 2002, are continuations of the '324 patent

although the '920 patent actually issued before the '324 patent.[3] All of the asserted claims from the patents in suit claim priority to the September 17, 1997 filing date of the '324 patent. The written description of the '920 patent is virtually identical to the '324 written description. The '405 written description, however, was amended during prosecution.

The problem facing the inventors of the patents in suit was how to continue to send and receive data on a mobile computing device (such as a laptop) when the device has changed physical locations, so that the device is no longer on its "home" network. (D.I. 284 at 3) The patents in suit disclose a routing system that: 1) forwards data generated by a local application across one of a number of different networks simultaneously connected to the mobile device; and 2) switches between the different networks while forwarding data. (D.I. 261 at 4) For example, a mobile device, such as a laptop computer, may be connected to two data networks, such as a wireless local area network (WLAN) and a wireless wide area network (WWAN). The invention enables the laptop to automatically transition from the WWAN to the WLAN while the laptop is downloading a data stream (e.g., performing a file transfer), without disrupting or reinitiating the transmission. (D.I. 284 at 6)

_____

[3]The '324 patent issued on July 9, 2002, the '920 patent issued March 6, 2002 and the '405 patent issued November 30, 2004.

In the Background of the Invention, the applicants reference a well-known and industry-adopted Open Systems Interconnection ("OSI") model, which shows the seven "layers" of communication. ('324 patent, col. 2, ll. 48-56)  "Each layer performs a specific task in transporting data between two or more entities."  ('324 patent, col. 2, ll. 56-58)  The patents in suit relate to the communication between two networks that are different at either the data link layer, the network layer or both.  The network layer is responsible for routing data packets from one network to another.  (D.I. 266 at 7)  In this process, each computer is assigned a logical network address, which is used by a router to determine how to forward packets from one network to another in cases where the networks use the same network protocol (such as IP).  (Id. at 7)  The data link layer is below the network layer and serves to adapt communication between the network layer and the bottom physical layer.[4]  (Id. at 7)

In the invention described in the patents in suit, two devices different at the network layer can communicate with each other by essentially going through a converter, called a "mobile data controller" in the patents.  (D.I. 266 at 5)  Converters are connected to a "router" that routes or forwards data from one network to another.  (Id.)  Converters translate the data from

---

[4]The physical layer is the layer at which data is physically transmitted.

the first device into the protocol required by the proprietary wireless network selected by the router, and then forwards that converted data from the proprietary protocol to the second device.  (Id.)  The second device then converts the data from the proprietary protocol to the protocol used on the second network. (Id.)

## III.   STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).  If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R.

Civ. P. 56(e)).  The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."  Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## IV.  DISCUSSION

An issued patent is presumed valid.  See 35 U.S.C. § 282. To overcome this presumption, the party challenging validity bears the burden of proving by clear and convincing evidence that the invention fails to meet the requirements of patentability. See Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1467 (Fed. Cir. 1990).  Clear and convincing evidence is evidence that "could place in the ultimate fact finder an abiding conviction that the truth of [the] factual contentions are 'highly probable.'"  Colorado v. New Mexico, 467 U.S. 310, 316 (1984).  General and conclusory testimony does not suffice as requisite "substantial evidence" of patent invalidity.  See CytoLogix Corp. v. Ventana Medical Systems, Inc., 424 F.3d 1168, 1176 (Fed. Cir. 2005).

### A.  Validity Of The '405 Patent

8

Defendant contends that the '405 patent is invalid for lack of written description and for indefiniteness.  (D.I. 275)

### 1.    Written Description Requirement

Defendant asserts that the limitation "remaining connected to the current network for a period of time after switching" is not supported by the specification, either implicitly or inherently.  Because each of the asserted claims contain this limitation, defendant asserts that the claims of the '405 patent are invalid.[5]

The specification of the '324 patent teaches that several networks can be connected at the same time.  The specification also teaches that networks are evaluated for their availability, health and connectivity status.  ('324 patent, col. 35, ll. 51-52; col. 37, ll. 15-19)  Plaintiff's expert has opined that, from the perspective of one of ordinary skill in the art, "[t]he

---

[5]Although phrased slightly differently, each independent claim of the '405 patent includes the limitation:  "Remaining connected to the current network for a period of time after switching to the current most preferred network" (claims 1, 17, 30, 61, 62 and 71); "after switching networks the local device remains connected to both the first network and the second network for a period of time" (claims 12, 25 and 34); "remaining connected to both the first network and the second network for a period of time" (claim 39); "remaining connected to the first network for a period of time after switching to the second network" (claim 50); "remains connected to the current network for a period of time after switching" (claim 51); "remaining connected to the at least two incompatible wireless networks for a period of time after switching" (claims 68, 69 and 70); and "remaining connected to the at least two dissimilar networks for a period of time after switching" (claim 72).

specification does not teach then disconnecting the original network, [therefore] the network remains connected after the switch for further monitoring."   (D.I. 346, ex. 5 at ¶ 128) While the language in the specification of the '324 patent suggests that multiple networks are connected, there is no explicit mention of a network staying connected after switching occurs.

Plaintiff argues that, because the language of the '324 specification makes clear to one of skill in the art that networks remain connected, even after a switch has occurred, the '405 patent is simply making explicit that which was already implicit in the '324 and '920 patent specifications.  "[T]he later explicit description of an inherent property does not deprive the product of the benefit of the filing date of the earlier application."   Therma-Tru Corp. v. Peachtree Doors Inc., 44 F.3d 988, 993 (Fed. Cir. 1995).  "In order for a disclosure to be inherent, however, the missing descriptive matter must necessarily be present in the parent application's specification such that one skilled in the art would recognize such a disclosure."   Tronzo v. Biomet, Inc., 156 F.3d 1154, 1159 (Fed. Cir. 1998)  The inquiry of whether the written description requirement is met is a factual one and must be assessed on a case-by-case basis.  See Vas-Cath v. Mahurkar, 935 F.2d 1555, 1561 (Fed. Cir. 1991).   Considering the patent specification of

10

the '324 patent and expert testimony, a genuine issue of material fact exists regarding whether the "remaining connected" limitation is inherent in the originally filed '324 application. Both party's motions for summary judgment on the issue are denied.

### 2. Best Mode

Plaintiff asserts that the claims of the '405 patent are not invalid for failure to disclose the best mode in the specification. "Compliance with the best mode requirement is a question of fact, and invalidity for failure of compliance requires proof by clear and convincing evidence that the inventor knew of and concealed a better mode of carrying out the invention than was set forth in the specification." Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1578 (Fed. Cir. 1991). If the "remaining connected" limitation is inherent in the '324 and '920 patents, it was not concealed for purposes of the best mode requirement. Defendant has produced no evidence of concealment, other than the argument that if the limitation is not inherent, then it must have been concealed. This argument is not sufficient to withstand a summary judgment motion. Plaintiff's motion for summary judgment on the best mode requirement is granted.

### 3. Indefiniteness

A patent specification shall conclude with one or more

11

claims that "particularly [point] out and distinctly [claim] subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2 (2003). The Federal Circuit has explained that a claim satisfies § 112, ¶ 2 if one skilled in the art would understand the bounds of the claim when read in light of the specification. See Miles Labs., Inc. v. Shandon, Inc., 997 F.2d 870, 875 (Fed. Cir. 1993). Given the presumption of validity, even "close questions of indefiniteness . . . are properly resolved in favor of the patentee." Exxon Research & Eng. Co. v. United States, 265 F.3d 1371, 1380 (Fed. Cir. 2001).

The "remaining connected" limitation of the asserted claims is not construed by the court because the parties agreed on the construction: "Remaining connected for a period of time beyond what is required for a hand-off. Remaining connected for a period of time, however, does not require remaining connected indefinitely or forever." Defendant asserts that it is not possible for a person of ordinary skill in the art to determine what amount of time meets the period of time limitation.

Defendant first argues that the term is indefinite because it is construed in terms of the time required for a "hand-off" as opposed to the time required for a "switch." The patent applicants defined the term using a "hand-off" reference because the PTO examiner questioned whether the claims distinguish "a

12

soft hand-off."[6]  The examiner, therefore, was familiar with a hand-off and the term is used in the prosecution history to distinguish the claimed invention.  Indeed, the fact that the examiner initiated use of the term suggests that a person of ordinary skill in the art does understand the term.  Defendant produces no evidence to the contrary.

Next, defendant argues the phrase is indefinite because a person of ordinary skill in the art would not be able to determine the minimum or maximum amounts of time that would be encompassed by the claims and that nothing in the specification teaches the length of the "period of time" covered by the patents.  Defendant asserts that plaintiff has admitted that the specification does not teach disconnecting the original network and, therefore, it cannot teach the period of time between switching and disconnecting.  The claims do not have to set out the minimum and maximum values for the period of time.  See Exxon Research & Eng., 256 F.3d at 1379 (finding the limitation "for a

_____

[6]In the prosecution history, the applicant stated:

> During the discussion, the Examiner questioned whether the claims distinguish a soft hand-off.  It is submitted that remaining connected to a network for a period of time after switching to another network requires remaining connected for a period of time beyond what is required for a hand-off.  Remaining connected for a period of time, however, does not require remaining connected indefinitely or forever.

('405 prosecution history, paper no. 13 at 21)

period sufficient" was "expressed in terms that [were] reasonably precise in light of the subject matter"). The issue is whether "one skilled in the art would understand the bounds of the claim when read in light of the specification." Exxon Research & Eng., 256 F.3d at 1375. The court in Exxon concluded that the limitation "for a period sufficient" was "expressed in terms that [were] reasonably precise in light of the subject matter." Id. at 1379.

At issue in the '405 patent is how long the connection is maintained beyond the amount of time associated with switching during a transmission. The court concludes that defendant has not raised a genuine issue of material fact regarding whether a person of ordinary skill in the art would understand the scope of the claim. Defendant's motion for summary judgment is denied and plaintiff's motion for summary judgment is granted in this regard.

**B.    Validity of the '324 Patent**

Plaintiff requests summary judgment that claims 60 and 67 of the '324 patent comply with the definiteness requirement. A claim is indefinite when it "is insolubly ambiguous, and no narrowing construction can properly be adopted." Exxon Research & Eng., 265 F.3d at 1375. While "courts may not redraft claims . . . to make them operable or to sustain their validity," Chef Am., Inc. v. Lamb Weston, Inc., 358 F.3d 1371, 1374 (Fed. Cir.

2004), the Federal Circuit "ha[s] not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what [it] ha[s] asked is that the claims be amenable to construction, however difficult that task may be." Exxon Research & Eng., 265 F.3d at 1375.

Defendant's argument revolves exclusively on the grammar of the claim.[7]  Defendant argues that the claims directed to a

_____

[7]Claim 45 reads:
A computer readable medium storing a computer program for routing data between a first device and a remote device over a plurality of parallel wireless networks, at least two of the networks being autonomous, dissimilar, connected to both the first device and the remote device, and available for data transmission, the computer program comprising:
transmitting over a first one of the networks; and transmitting over the second network;
wherein a transmission between the first device and the remote device occurs while switching from the first network to the second network.
'324 patent, col. 43, ll. 32-43.  Claim 59 reads:
A computer readable medium storing a program for dynamically routing data in a system comprising a first device and a plurality of remote devices, the first device being connected to a plurality of parallel wireless communications links. . ., each of the remote devices being connected to one parallel wireless communications link or the plurality of parallel wireless communications links. . ., comprising:
maintaining active communications links. . .;
contemporaneously monitoring the status of the plurality of parallel dissimilar wireless communication links;
transmitting over a first available communications link as needed;
switching from the first communications link to a second available communications link;
transmitting over the second communications link;
wherein the transmission between the first device and the remote device occurs while switching from the first

computer readable medium performing certain recited functions are "nonsensical" and, therefore, are indefinite.  Claims 59 and 66 of the '324 patent are directed to a "computer readable medium" capable of performing functions.  By contrast, other computer readable medium claims in the '324 patent recite that any functions to be performed are performed by the computer program which is stored on the computer readable medium.

Defendant has produced no evidence that one of ordinary skill in the art would fail to understand the bounds of the asserted claims 60 and 67 of the '324 patent.  Furthermore, defendant has produced no evidence that the claims contain a limitation that is contrary to the teachings of the patent specification, as a matter of law, as required by <u>Allen Eng'g Corp. v. Bartell Indus.</u>, 299 F.3d 1336, 1349 (Fed. Cir. 2002).  Summary judgment in favor of plaintiff is granted.

## V.   CONCLUSION

For the reasons discussed above, plaintiff's motion for summary judgment is denied in part and granted in part, and defendant's motion for summary judgment is denied.  An order consistent with this memorandum opinion shall issue.

---

communications link to the second communications link. '324 patent, col. 44, ll. 19-49.

16