IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PADCOM, INC., | ) |
| | ) |
| Plaintiff and | ) |
| Counterclaim | ) |
| Defendant, | ) |
| | ) |
| v. | )   Civ. No. 03-983-SLR |
| | ) |
| NETMOTION WIRELESS, INC., | ) |
| | ) |
| Defendant and | ) |
| Counterclaim | ) |
| Plaintiff. | ) |

Josy W. Ingersoll, Esquire and Adam Poff, Esquire of Young,
Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware.  Counsel
for Plaintiff and Counterclaim Defendant.  Of Counsel:  Neil F.
Greenblum, Esqire, Jill M. Browning, Esquire and Van C. Ernest,
Esquire of Greenblum & Bernstein, PLC, Reston, Virginia.

William J. Marsden, Jr., Esquire and Sean P. Hayes, Esquire of
Fish & Richardson, PC, Wilmington, Delaware, Katherine Kelly
Lutton, Esquire of Fish & Richardson, Redwood City, California,
Barry K. Shelton, Esquire of Fish & Richardson, Austin, Texas.
Counsel for Defendant and Counterclaim Plaintiff.

**MEMORANDUM OPINION**

Dated: February 22, 2006
Wilmington, Delaware

ROBINSON Chief Judge

## I. INTRODUCTION

On October 27, 2003, Padcom, Incorporated ("plaintiff")
filed this action against NetMotion Wireless Incorporated
("defendant") for infringement of certain claims of United States
Patent Nos. 6,198,920 ("the '920 patent") and 6,418,324 ("the
'324 patent"). (D.I. 1) On June 9, 2004, plaintiff filed a
first amended complaint including infringement of United States
Patent No. 6,826,405 ("the '405 patent") and on June 30, 2004,
defendant filed a counterclaim. (D.I. 44, 47) On January 5,
2005, plaintiff filed a second amended complaint. (D.I. 89)

The asserted claims have been narrowed to claims 6 and 16 of
the '920 patent, claims 10, 49, 58, 60 and 67 of the '324 patent
and claims 18, 19, 22, 23, 39, 44, 68 and 71 of the '405 patent.
Before the court are plaintiff's motion for summary judgment of
infringement of claims 39, 44 and 68 of the '405, claim 49 of the
'324 patent and claim 6 of the '920 patent and defendant's motion
for summary judgment of noninfringement of the asserted claims of
the '920, '324 and '405 patents.

## II. Background

### A. The Parties

Plaintiff is a company that develops, makes, licenses, sells
and services software and hardware products that enhance
connectivity for wireless network users and simplify
administration, control and support of mobile solutions. (D.I.

89 at ¶ 12)   In about 1995, plaintiff created and provided
internet protocol ("IP") data over private radio frequency ("RF")
networks for its wireless customers.   (Id. at ¶ 13)   Plaintiff
also developed technology enabling communications over multiple
active networks, using a variety of protocols and seamlessly
switching among the networks to maintain and improve
connectivity.   (Id. at 14)

In February of 2001, defendant entered the
telecommunications software market.   (D.I. 340 at 3)   Defendant
developed patented technology that allows mobile users to
maintain persistent, secure connections to applications, networks
and data as they seamlessly roam between offices, buildings or
global locations.   (D.I. 95 at 6)

## B.   Technology

In the mid-1990s, there were many different wireless (e.g.,
cellular) communications networks.   (D.I. 266 at 3)   Examples
include a large variety of proprietary radio systems licenses for
private or government use and public wireless networks such as
those used for cell phone communications.[1]   (Id.)   Most of these
wireless networks were designed for voice communication and did

---

[1]The standards used for the public wireless networks
included Advanced Mobile Phone System (AMPS), Global System for
Mobile Communications (GSM), used by Cingular and T-Mobile and
Code Division Multiple Access (CDMA), which is the standard used
by carries such as Verizon Wireless, Sprint PCS and Alltel.
(D.I. 266 at 4)

2

not provide interfaces or protocols for data communication (such as transferring text messages, emails, pictures or video messages wirelessly). (Id.) To address these needs, additional standards were established so that data could be carried over public wireless networks originally designed for voice.[2] (Id.) These standards enabled use of the industry-standard network format known as the Internet Protocol (IP) for such data communications. (Id.) Throughout the 1990s, private networks, used primarily by public safety services like law enforcement and companies with field service employees, remained proprietary and inherently incompatible with one another. (Id.) They did not, at that time, use the IP.

A need existed to convert data between mobile devices (such as laptops) and host (fixed) devices (such as computers on a wired network), regardless of the networks connecting them. In other words, there existed a need to allow two devices on dissimilar or incompatible networks to talk to one another. (Id.)

The mobile computing community recognized the utility of permitting the mobile commuting device to automatically roam from network to network without disrupting the sending and receiving

---

[2]One example of such a standard is Cellular Digital Packet Data (CDPD), which added the capability of sending and receiving data over existing AMPS analog cellular telephone networks. (D.I. 266 at 4)

3

of data. (D.I. 284 at 3) Typically, most applications or communication sessions would be disrupted once the device was no longer connected to the first network. (Id.) This caused the data transmission to stop and the user would manually restart the transmission once connectivity on the new network was obtained. (Id.)

## C.   Patents in Suit

The invention of the patents in suit is generally directed to sending and receiving a data transmission over different wireless data networks and switching among these different networks without interrupting the data transmission or disrupting the application. Plaintiff is the owner of the '324 patent, entitled "Apparatus and Method for Transparent Wireless Communication Between a Remote Device and Host System," the '920 patent, entitled "Apparatus and Method for Intelligent Routing of Data Between a Remote Device and a Host System," and the '405 patent, entitled "Apparatus and Method for Intelligent Routing of Data Between a Remote Device and a Host System." (D.I. 89 at ¶¶ 8-10)

The patents in suit are continuations-in-part of an earlier patent, United States Patent No. 5,717,737 (not in suit). The first of the patents in suit was the '324 patent, filed September 17, 1997. The '920 patent, filed March 16, 2000 and the '405 patent, filed June 10, 2002, are continuations of the '324 patent

4

although the '920 patent actually issued before the '324 patent.[3] All of the asserted claims from the patents in suit claim priority to the September 17, 1997 filing date of the '324 patent. The written description of the '920 patent is virtually identical to the '324 written description. The '405 written description, however, was substantively amended during prosecution.

The problem facing the inventors of the patents in suit was how to continue to send and receive data on a mobile computing device (such as a laptop) when the device has changed physical locations, so that the device is no longer of its "home" network. (D.I. 284 at 3) The patents in suit disclose a routing system that forwards data generated by a local application across one of a number of different networks, which are simultaneously connected to the mobile device and that switches between the different networks while forwarding data. (D.I. 261 at 4) The inventors of the patents in suit sought to develop a system to switch from one network to another without disruption. (Id.) For example, a mobile device, such as a laptop computer, may be connected to two data networks, such as a wireless local area network (WLAN) and a wireless wide area network (WWAN). The invention enables the laptop to automatically transition from the

---

[3]The '324 patent issued on July 9, 2002, the '920 patent issued March 6, 2002 and the '405 patent issued November 30, 2004.

5

WWAN to the WLAN while the laptop is downloading a data stream
(e.g., performing a file transfer), without disrupting or
reinitiating the transmission.  (D.I. 284 at 6)

In the Background of the Invention, the applicants reference
a well-known and industry-adopted Open Systems Interconnection
("OSI") model, which shows the seven "layers" of communication.
('324 patent, col. 2, ll. 48-56)  "Each layer performs a specific
task in transporting data between two or more entities."  ('324
patent, col. 2, ll. 56-58)  The patents in suit relate to the
communication between two networks that are different at either
the data link layer, the network layer or both.  The network
layer is responsible for routing data packets from one network to
another.  (D.I. 266 at 7)  In this process, each computer is
assigned a logical network address, which is used by a router to
determine how to forward packets from one network to another in
cases where the networks use the same network protocol (such as
IP).  (Id. at 7)  The data link layer is below the network layer
and serves to adapt communication between the network layer and
the bottom physical layer.[4]  (Id. at 7)

In the invention described in the patents in suit, two
devices different at the network layer can communicate with each
other by essentially going through a converter, called a "mobile

---

[4]The physical layer is the layer at which data is physically
transmitted.

6

data controller" in the patents.  (D.I. 266 at 5)  These converters are connected to a "router" that routes or forwards data from one network to another.  (Id.)  This converter translates the data from the first device into the protocol required by the protocol required by the proprietary wireless network selected by the router, and then forwards that converted data from the proprietary protocol to the second device.  (Id.) The second device then needs to convert the data from the proprietary protocol to the protocol used on the second network. (Id.)

## D.  Accused Products

The accused product, *Mobility*, is a software-only solution with two components.  (D.I. 349 at 5)  The first component, the *Mobility* client, is installed by a customer on Microsoft Windows-based user devices, such as laptops and personal digital assistants.  (Id.)  The second component, the *Mobility* server, is installed by a customer on Microsoft Windows-based server-class computers.  (Id.)  The *Mobility* client and *Mobility* server are only compatible with networks employing the IP as the network layer protocol.  (Id.)  A single *Mobility* server device is designed to service multiple *Mobility* client devices, which are typically mobile computers (e.g., laptops).  (D.I. 296 at 5-6) The *Mobility* server device operates from a fixed location on a local area network (LAN) with an Application server.  (Id. at 6)

7

A mobile *Mobility* client device roams from location to location
and consecutively switches networks. (Id. at 6) *Mobility*
"optimizes" data communications over dissimilar networks,
including roaming. (Id.) *Mobility* server and *Mobility* client
are specifically designed to interface with Microsoft Windows
operating systems. (Id. at 7) The present action is directed to
ten accused products, which are actually ten incremental versions
of *Mobility*: versions 3.0, 3.1, 3.5, 4.0, 4.01, 5.0, 5.01, 6.0
(XE) and 6.01 (also XE).

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). The moving party bears the burden of proving that no
genuine issue of material fact exists. See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).
"Facts that could alter the outcome are 'material,' and disputes
are 'genuine' if evidence exists from which a rational person
could conclude that the position of the person with the burden of
proof on the disputed issue is correct." Horowitz v. Fed. Kemper
Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal
citations omitted). If the moving party has demonstrated an

8

absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## IV. Discussion

### A. Infringement of Software Product

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A court should employ a two-step analysis in making an infringement determination. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995). First, the court must construe the asserted claims to ascertain their meaning and scope. Id. Construction of the claims is a question of law subject to de novo review. See Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998). The trier of fact must then

9

compare the properly construed claims with the accused infringing product. Markman, 52 F.3d at 976. This second step is a question of fact. See Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998). Literal infringement occurs where each limitation of at least one claim of the patent is found exactly in the alleged infringer's product. Panduit Corp. v. Dennison Mfg. Co., 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987). An accused product that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused product either literally or equivalently. See Sextant Avionique, S.A. v. Analog Devices, Inc., 172 F.3d 817, 826 (Fed. Cir. 1999). Occasionally, "the issue of literal infringement may be resolved with the step of claim construction, for upon correct claim construction, it may be apparent whether the accused device is within the claims." Multiform Desiccants, Inc. v. Medzam, 133 F.3d 1473, 1476 (Fed. Cir. 1998). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

In Fantasy Sports Properties, Inc. v. Sportsline.com, Inc., 287 F.3d 1108 (Fed. Cir. 2002), the Federal Circuit addressed the issue of whether a software product could directly infringe a claim for "a computer for playing football." The claim set forth

10

a number of means-plus-function limitations that the software

must contain.  The court explained:

> Software is a set of instructions, known as code, that
> directs a computer to perform specified functions or
> operations.  Thus, the software underlying a computer
> program that presents a user with the ability to select
> among a number of different options must be written in
> such a way as to enable the computer to carry out the
> functions defined by those options when they are
> selected by the user.  Therefore, although a user must
> activate the functions programmed into a piece of
> software by selecting those options, the user is only
> activating means that are **already present in the**
> **underlying software**.

Id. at 1118.  The court concluded that the software could

directly infringe even though the claim was directed towards a

"computer."

> The record clearly demonstrates that the
> Commissioner.com product is software installed on a
> computer that enables a user to play fantasy football
> games over the Internet.  Indeed, the web pages
> advertising the Commissioner.com product promote it as
> "a utility designed to run a head-to-head Fantasy
> Football League," and that "getting started is easy" in
> that a user may immediately begin playing fantasy
> football after performing a few simple steps. . . .
> Consequently, a user need only utilize the Scoring
> Wizard program . . . to play a fantasy football game
> that provies for the awarding of bonus points . . . and
> thus that means is necessarily present in the software.

Id. at 118-19.  Therefore, a software product can infringe when

it interacts with an operating system on a computer, so long as

the software, without the operating system, contains all the

limitations set out in the claim.

Mobility comes with instructions on how to install the

product on computers having Windows operating systems and

11

defendant provides instructions on how to activate features of
the software that allegedly infringe. *Mobility* uses Windows as a
tool to accomplish the infringing conduct.[5]  The fact that the
operating system may be performing some acts specified by the
software does not defeat the infringement claim.

## B.  Claims 39 and 44 of the '405 Patent

### 1. Computer readable  medium

Defendant's software is distributed on a CD-ROM.  Defendant
asserts that the product is not on a "computer readable medium."
However, defendant provides no support for this statement and,
therefore, provides no basis for a genuine issue of material
fact.  Plaintiff provided expert testimony that the product was
on a computer readable medium, which defendant did not rebut.
Plaintiff's motion for summary judgment on this limitation is
granted.

### 2.  Dynamically routing data

The court defined this term as "hardware and/or software
operating at the network layer that directs data between
networks."  Plaintiff has produced expert testimony that the
*Mobility* software **takes control** of the Windows routing table and

---

[5]See, e.g., the prosecution history, in which the applicants
overcame a rejection under 35 U.S.C. § 112, ¶ 2 explaining that
it is sufficient for a computer program to "cause" claimed
functionality: "It is believed, however, that a computer program
can transmit, as claimed.  More particularity, execution of the
computer program causes the computer to transmit."

12

uses it to route data as determined by *Mobility*." (D.I 299, ex. 1, ¶ 18(c)(M)) Defendant's expert states that *Mobility* operates above the transport layer, placing it "well above the network layer." (D.I. 299, ex.2 at ¶ 60) As a result, defendant has raised a genuine issue of material fact whether the software dynamically routes data consistent with the court's definition. Plaintiff's motion is denied.

### 3. Dissimilar networks

The court construed "dissimilar networks" to mean "different at either the network or the data link layers, or at both layers." Defendant bases its argument of noninfringement on its claim construction, which the court declined to accept. *Mobility* is only compatible with networks that are the same at the network layer. However, if the networks are different at the data link layer, they are still dissimilar under the court's definition. Therefore, defendant's motion is denied and plaintiff's motion is granted.

### 4. Availability code segment

Plaintiff asserts that *Mobility* ascertains availability of the networks based on status information. Defendant asserts that "all selection of networks and switching between networks is always done by the unmodified Windows. . .." (D.I. 299, ex. 2 at ¶ 87) Plaintiff produced expert testimony that the nalRoutToHost function "walks systematically through the client-side routing

13

table, observes which network interfaces are available, and detects the one that is 'best.'" (D.I. 299, ex. 17, at 15) Defendant asserts that "[t]he description for the nalRouteToHost function is incorrect," but provides no support in the way of expert testimony for this statement.[6] Defendant's expert states that he agrees that "*Mobility* allows the user to review the status of each network connected to the client," but he argues that the information is received from Windows. The court concludes that, even if the operating system supplies the information to the software, the software, if it ascertains the

---

[6]Defendant cites to D.I. 299, ex. 2, at ¶ 29, 57. These citations provide no support for the statement they are meant to support. Indeed, defendant's brief is replete with citations to the record that do not support the statements asserted. By way of example, defendant writes that "Mobility client software does not contain a 'determining code segment that determines whether to switch between networks.' (D.I. 299, Padcom App. Ex. 23 at ¶ 59)" However, the court's version of D.I. 299, exhibit 23 contains only 49 paragraphs. Another critical assertion by defendant, without which defendant can not raise a genuine issue of material fact regarding the switching code segment limitation, again references a nonexistent paragraph of D.I. 299, exhibit 23: "The functions cited by Mr. Bach, namely rpcwrk.c, lines 770 and 775, roamRefresh function in roam.c, and ncpCalculateRouteToPeer in ncproute.c do not determine when to switch from one network to another. (D.I. 299, Padcom App. Ex. 23 at ¶ 58)" Finally, for the assertion that "nalRouteToHost in naliface.c is also called to verify that a route still exists to the Mobility server," defendant cites to D.I. 299 Padcom App. Ex. 23 at ¶ 29, which pertains to the combination of the Project Octopus reference and the Monarch Project or BARWAN references. The assertions that are not supported by the record will not be considered. If the court has misunderstood the citations or if the record submitted does contain the support but the court was only misdirected, the court will entertain a brief motion of clarification from defendant.

14

availability of the networks, directly infringes.   Here,
defendant has not raised a genuine issue of material fact that
*Mobility* does not include an availability code segment.

## 5.   Determining code segment

Plaintiff asserts that the combination of *Mobility* and
Windows determines whether to switch between networks.   Plaintiff
also asserts that *Mobility* modifies the metric of the Windows
routing table and allows users to override the reported metric to
dictate the priority of the networks.   Plaintiff's expert
identified the determining code segments as represented by
"rpcwrk.c, lines 770 and 775, the roamRefresh function at roam.c
and the ncpCalculateRouteToPeer function at ncproute.c."   (D.I.
299, ex. 17 at 29)   Defendant's expert asserts that the operating
system, whether *Mobility* software is installed or not, determines
which network interface will be used for data based on network
availability and the Windows routing table.   (D.I. 299, ex. 2 at
¶ 87)   This general assertion, without reference to any source
code, is not sufficient to raise a genuine issue of material fact
as to whether *Mobility* contains a determining code segment.

## 6.   Switching code segment

Defendant asserts that the *Mobility* software submits
application layer data to the operating system in the form of
Internet Mobility Protocol (IMP) frames.   These frames are
encapsulated into UDP datagrams and then into IP packets - both

15

by the operating system.  The operating system then determines
what network interface should be used to send the IP packet based
on the destination IP address of each packet.  As a result,
defendant argues the operating system switches.  Plaintiff has
produced evidence that, without the *Mobility* software, Windows
will not switch networks during a file transfer.  Furthermore,
plaintiff's expert identified the principal switching code
segment in the "function ncpCalculateRouteToPeer at ncproute.c."
Lacking rebuttal evidence that the segment does not exist in the
software, defendant has not raised a genuine issue of material
fact whether *Mobility* or Windows switches from one network to
another.

### 7.  Remaining connected to the network after switching

It is undisputed that the Windows-*Mobility* combination takes
no action to disconnect from a current network after or during
the switch to the next network.  Indeed, defendant's expert
agrees that it is not uncommon that the network switched from, if
still available, will remain connected.  The expert maintains,
however, that this has nothing to do with *Mobility* (D.I. 299, ex.
2 at ¶ 82),  because *Mobility* software does not control network
interfaces;  Windows, not *Mobility*, switches between the networks
and, therefore, it is Windows that remains connected.  The court
concludes that the "remaining connected" limitation can be met
when no action is taken to disconnect from the previous network.

16

Because summary judgment has been granted for the "switching segment" limitation, defendant has raised no genuine issue of material fact regarding the "remaining connected" limitation.

## 8.  Packet size code segment

Both parties agree that *Mobility* adjusts the size of the IMP frames submitted to the underlying operating system.  Plaintiff asserts that the size of the packet ultimately created is completely determined by the size of the IMP frame submitted by *Mobility*.  Defendant argues that the IP layer is responsible for determining the size of the packet prior to transmission; the IP layer will automatically fragment data passed to it to ensure the IP packet size does not exceed the Maximum Transmission Unit (MTU) of the physical network.  Defendant admits, however, that the specific functions cited by plaintiff are functions in *Mobility* that determine the MTU for a network.  While the operating system may actually package the data, *Mobility* determines the packet size, as required by the claim.  Therefore, defendant has not raised a genuine issue of material fact that *Mobility* does not contain a packet size code segment.  Summary judgment motion is granted in favor of plaintiff.

## C.  Claim 68 of the '405 Patent

Claim 68 of the '405 patent requires "a local device," "a

17

server," and "a mobile device."[7]  Plaintiff does not, and cannot,
assert that defendant's accused product, alone, infringes all the
limitations of the claim.  Rather, plaintiff asserts that
infringement occurs when the software is installed on a computer
and data is transferred in accordance with the software between a
mobile device and a local device.  The court has concluded that
the installed software can satisfy the device limitation of the
claim.  As a result, defendant or a third party can infringe the
entire system claim when using the installed software in
connection with the other claim limitations.  The court is not
inclined, however, to grant summary judgment without a limitation
by limitation analysis on any specific acts of infringement.
Plaintiff's motion for summary judgment is denied.

**D.  Claim 49 of the '324 Patent**

> **1.  Computer readable medium, routes data,
> transmission occurs while switching, monitors to
> determine availability**

The parties make the same arguments with respect to these
claim limitations as were discussed above.  The court found no
genuine issue of material fact with respect to the computer

_____

[7]Claim 68 of the '405 patent requires:  (1) a local device;
(2) a server connected to the local device, the server being
connected to a plurality of incompatible wireless networks; (3) a
mobile device that sends data to the local device via at least
two of the plurality of incompatible wireless networks while
switching between the two networks and remaining connected to the
two networks for a period of time after switching.  ('405 patent,
col. 49, ll. 22-40)

readable medium. The court found a genuine issue of material fact existed as to whether *Mobility* dynamically routed data, which corresponds to the "routes data" limitation. The court found no genuine issue of material fact with respect to the switching code segment, which corresponds to the "transmission occurs while switching" limitation. The court granted plaintiff's motion on the availability code segment, which relates to the "monitors to determine availability" limitation.

### 2. Transmitting over first and second networks

Defendant and plaintiff agree that *Mobility* software submits IMP frames to the operating system, which encapsulates them into UDP datagrams and then into IP packets for transmission on the network. Defendant does not state what, if not the *Mobility* software, is responsible for the transmitting. As a result, no genuine issue of material fact is raised and summary judgment is granted in plaintiff's favor.

### 3. Selects a next available network

Plaintiff presents expert evidence that *Mobility* receives status information on the networks, assigns a metric to a new network when it becomes available and adjusts the metrics of the Windows routing table so that the network is ordered, according to the priority determined by *Mobility*, and selected when it becomes the highest priority network. Defendant only asserts in defense that it is the Windows operating system that finally

19

retrieves the next highest priority network when the first
network becomes unavailable. If the software instructs the
operating system which network to retrieve, it is in fact
"selecting" even though the operating system may perform the
final step. However, defendant presents expert testimony that
all selection of networks is always done by the Windows operating
system. Because there is a genuine issue of material fact,
summary judgment is denied.

### 4. Switching between data packets

Defendant raises the same argument as raised for the
"switching code segment" limitation. Defendant merely re-
iterates that only the operating system determines when to
transport packets and over which of the available networks. As
stated above, defendant does not raise a genuine issue of
material fact and plaintiff's summary judgment motion is granted.

### E. Claim 6 of the '920 Patent

All of the parties' arguments related to this claim are
addressed with respect to other claims. Defendant raises a
genuine issue of material fact with respect to the router
limitation. Defendant raises no issue of material fact regarding
the monitoring limitation of the claim, as discussed above with
respect to the availability code segment. The court declines to
address the issue of whether the router has a first and second
interface, given the fact that the parties have not briefed the

20

construction of this limitation.[8] Defendant raises a genuine
issue of material fact regarding whether *Mobility* has a
"selector," as discussed above for "selecting a next available
network." Defendant raises no issue of material fact regarding
the "transmission" limitation. Finally, defendant does not raise
a genuine issue of material fact regarding whether Mobility
"switches."

## F. Indirect Infringement

Under both contributory and induced infringement theories,
there must be evidence showing direct infringement. See Linear
Technology Crop. v. Impala Linear Corp., 379 F.3d 1311, 1326
(Fed. Cir. 2004). Establishing active inducement of infringement
also requires proof of intent to cause the acts which constitute
the direct infringement. See Water Techs. Corp. v. Calco, Ltd.,
850 F.2d 660, 668 (Fed. Cir. 1998). Contributory infringement
also requires proof of defendant's knowledge that the activity
caused infringement. See Hewlett-Packard Co. v. Bausch & Lomb,
Inc., 909 F.2d 1464, 1469 (Fed. Cir. 1990).

Plaintiff has produced evidence that defendant's employees
and agents: (1) have fully operational *Mobility* software loaded
on their corporate computers together with the operating system;
(2) routinely demonstrate the features of *Mobility*, including the

---

[8]If necessary, the court will address the claim construction
in the jury instructions.

roaming functionality, to third parties; and (3) have installation and maintenance contracts with third parties. (D.I. 333 at 16-19) Plaintiff has also presented evidence that defendant has sold and licensed *Mobility* to customers, together with documentation describing the accused roaming functionality and how to implement various infringing features. (D.I. 333 at 19) Plaintiff has produced evidence of at least one instance where defendant directly infringed the claim.[9]

Plaintiff has produced sufficient evidence of direct infringement by defendant or third parties to survive defendant's summary judgment motion. However, the court declines to grant summary judgment for plaintiff without a limitation by limitation analysis on any specific acts of direct infringement. Furthermore, plaintiff has not produced sufficient evidence regarding the intent or knowledge of defendant in order to satisfy its burden on its motion for summary judgment.[10] As a result, both parties' motions for summary judgment of indirect infringement are denied.

---

[9]Plaintiff's Chief Scientist demonstrated *Mobility* functionality to defendant's patent attorney. This demonstration included switching during a transmission by connecting a laptop computer to two different wireless networks and removing the network interface card of one of the networks. (D.I. 333 at 18)

[10]Plaintiff did raise a genuine issue of material fact regarding these elements to survive defendant's summary judgment motion on indirect infringement.

## G.   Defendant's Motion for Summary Judgment of Non-Infringement

Defendant requests summary judgment of no infringement under the doctrine of equivalents.[11]  For there to be infringement under the doctrine of equivalents, the accused product or process must embody every limitation of a claim, either literally or by an equivalent.  Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 41 (1997).  A limitation is equivalent if the differences between the element and the claim limitation are "insubstantial."  Zelinski v. Brunswick Corp., 185 F.3d 1311, 1316 (Fed. Cir. 1999).  One test used to determine "insubstantiality" is whether the element performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation.  Graver Tank, 339 U.S. at 608.  This test is commonly referred to as the "function-way-result" test.  The mere showing that an accused device is equivalent overall to the claimed invention is insufficient to establish infringement under the doctrine of equivalents.

The supplemental report of plaintiff's expert James Bach was

---

[11]Defendant's argument that *Mobility* does not support dissimilar networks is rejected as a result of the court's construction of "dissimilar networks."  Furthermore, defendant's argument that "autonomous" must be construed to require no common links between the networks is denied.  The parties agreed on the construction that, to be autonomous, the networks must not be connected to one another nor have any "arrangements" with one another.

23

the first reference to the doctrine of equivalents. Mr. Bach
does not perform a claim by claim analysis, let alone a
limitation by limitation analysis. Plaintiff's expert report is
not sufficient to sustain a claim of infringement under the
doctrine of equivalents. The court grants defendant's motion for
summary judgment of noninfringement under the doctrine of
equivalents.[12]

## V.    CONCLUSION

For the reasons discussed above, plaintiff's motion for
summary judgment is granted in part and denied in part, and
defendant's motion for summary judgment is granted in part and
denied in part. An order consistent with this memorandum opinion
shall issue.

---

[12]The court denies plaintiff's cross motion for summary
judgment on the issue.

24